THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed: August 22, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

‐‐‐‐

Trademark Trial and Appeal Board

‐‐‐‐

*In re Erik Brunetti*

‐‐‐‐

Serial Nos. 88308426, 88308434, 88308451, and 88310900

‐‐‐‐

John R. Sommer, Attorney at Law,
    for Erik Brunetti.

Curtis W. French, Trademark Examining Attorney, Law Office 130,
    John Lincoski, Managing Attorney.

‐‐‐‐

Before Bergsman, Dunn and Lebow,
    Administrative Trademark Judges.

Opinion by Lebow, Administrative Trademark Judge:

Applicant, Erik Brunetti, seeks to register the word FUCK (in standard characters) on the Principal Register in four one-class applications identifying, respectively, the following goods or services:

> Carrying cases for cell phones; carrying cases specially adapted for pocket calculators, laptops and cellphones; cases adapted for mobile phones; cases for spectacles and sunglasses; cell phone cases; spectacles and sunglasses, in International Class 9;[1]

---

[1] Application Serial No. 88308426 was filed on February 20, 2019, under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), based on Applicant's claim of a bona fide intent to use the mark in commerce.

Jewelry, earrings, rings, bracelets of precious metal, ornamental lapel pins, jewelry in the nature of personal identification tags made of precious metal for wear by humans for decorative purposes, watches, watch bands, cases adapted for holding watches, watch straps, in International Class 14;[2]

All purpose sport bags; all-purpose athletic bags; all-purpose carrying bags; backpacks; book bags; carry-on bags; carryalls; duffel bags; fanny packs; luggage; shoulder bags; sports bags; sports packs; tote bags; waist bags; waist packs; wallets, in International Class 18;[3] and

Retail services in the nature of commercial information and advice for consumers in the choice of products and services; provision of information and advice to consumers regarding the selection of products and items to be purchased; provision of business advice and assistance in the nature of consumer information regarding the selection of goods; advertising for others; promotion of goods and services of others through provision of sponsored links to third party websites; direct marketing services; online trading services in which seller posts products to be auctioned and bidding is done via the internet; advertising and business management consultancy; retail store services featuring a wide variety of consumer goods of others; retail store and online retail store services featuring accessories for cellphones and computers, audio disks, audio-visual disks, bags, bedding, books, cigarette lighters, clothing, decals, downloadable music files, downloadable audio-visual files, footwear, headwear, housewares, jewelry, sporting goods, stickers, sunglasses, towels, toys and watches; providing consumer product advice relating to a wide variety of consumer goods of others; commercial information and advice for consumers in the choice of products and services; providing business advice and commercial information relating to retail services; promoting the goods and services of others by providing a web site featuring links to third party retailers' websites, in International Class 35.[4]

---

[2] Application Serial No. 88308434 was filed on February 20, 2019, under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), based on Applicant's claim of a bona fide intent to use the mark in commerce.

[3] Application Serial No. 88308451 was filed on February 20, 2019, under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), based on Applicant's claim of a bona fide intent to use the mark in commerce.

[4] Application Serial No. 88310900 was filed on February 21, 2019, under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), based on Applicant's claim of a bona fide intent to use the mark in commerce.

The Trademark Examining Attorney issued a final refusal to register in each application under Sections 1, 2, 3, and 45 of the Trademark Act, 15 U.S.C. §§ 1051-53 and 1127, on the ground that the word FUCK "is a slogan or term that does not function as a trademark or service mark to indicate the source of applicant's goods and/or services and to identify and distinguish them from others."[5]

When a proposed mark fails to meet the statutory definition of a trademark, it is ineligible for registration. Section 1 of the Trademark Act permits only a "trademark" to be registered. 15 U.S.C. § 1051. Section 45 of the Trademark Act defines a trademark as a "word, name, symbol, or device, or any combination thereof" that is used "to identify and distinguish [the owner's] goods" or "to identify or distinguish the services of one person." 15 U.S.C. § 1127. A proposed mark that fails to identify or distinguish goods or services does not meet the statutory definition of a mark, and thus cannot be registered.

Applicant filed an appeal and requested reconsideration in each application, which requests were denied. After Applicant filed an appeal brief in each case, the

---

[5] August 3, 2020 Final Office Actions, TSDR 5 (88308426, 88308451); December 30, 2020 Final Office Action, TSDR 5 (88308434); January 19, 2021 Final Office Action, TSDR 7 (88310900). Citations in this opinion to the briefs and other docket entries on appeal refer to TTABVUE, the Board's online docketing system. *Turdin v. Tribolite, Ltd.*, 109 USPQ2d 1473, 1476 n.6 (TTAB 2014). The number preceding TTABVUE corresponds to the docket entry number, and any numbers following TTABVUE refer to the page number(s) of the docket entry where the cited materials appear. Citations to the prosecution history record in these proceedings refer to the downloaded .pdf versions of the referenced documents in the Case Viewer of the USPTO's Trademark Status & Document Retrieval ("TSDR") database.

Although the failure-to-function refusal is normally a specimen-based refusal, a refusal must be issued, regardless of the filing basis, if the evidence supports a determination that a proposed mark is merely informational and thus would not be perceived as an indicator of source. TRADEMARK MANUAL OF EXAMINING PROCEDURE (TMEP) § 1202.04 (July 2021).

applications were consolidated. The Examining Attorney then filed a consolidated brief, and Applicant filed a consolidated reply brief. "Because these appeals present similar issues, we issue a single opinion for [all]." *In re Consumer Protection Firm*, 2021 USPQ2d 238, at *4 (TTAB 2021) ("[E]ach proceeding retains its separate character and will result in the entry of a separate judgment for each appealed application; a copy of this decision shall be placed in each proceeding file.").

For the reasons that follow, we affirm the refusals to register FUCK for the identified goods and services.

## I.    Evidentiary Issues

The Examining Attorney objects to Applicant's references in its appeal briefs to various third-party registrations and pending applications that were not made of record during prosecution. The Examining Attorney maintains that the applications' records should be complete prior to appeal.[6]

Applicant responds that the Examining Attorney's objection "would be a well-founded objection … if the registrations were being cited as evidence. (All

---

[6] 26 TTABVUE 6-7 (Examining Attorney's Brief).

The Examining Attorney notes that Applicant filed essentially the same appeal brief for each of the four consolidated cases, and indicates that his evidence citations in the appeal will refer to the TSDR page numbers for the office actions and responses in Application Serial No. 88308434, unless otherwise indicated. 14 TTABVUE 6 n. 1 (Serial No. 88308426); 26 TTABVUE 6 n. 1 (Serial No. 88308434); 24 TTABVUE 6 n. 1 (Serial No. 88308451); 29 TTABVUE 6 n. 1 (Serial No. 88310900). We will do the same. Our citation to the appeal briefs for both Applicant and the Examining Attorney, and the reply brief for Applicant, will similarly refer to the TTABVUE entries for Application Serial No. 88308434 filed at 22 TTABVUE, 26 TTABVUE and 27 TTABVUE, respectively. The Examining Attorney's consolidated appeal brief is filed at 14 TTABVUE for Application Serial No. 88308426; 26 TTABVUE for Application Serial No. 88308434; 24 TTABVUE for Application Serial No. 88308451; and 29 TTABVUE for Application Serial No. 88310900.

registrations being cited as evidence are in the record.).")[7] Applicant contends that he merely cited those third-party registrations to show that the cases cited by the Examining Attorney do not stand for the proposition for which they were cited. According to Applicant, "[i]t is the PTO that opened the door by relying on these legal authorities in its reconsideration and brief, and urging that the cases stand for certain legal propositions. [Applicant] is entitled to argue what legal weight is given to the legal authorities cited by the PTO."[8] Applicant offers a solution: "If the PTO wishes to acknowledge that such cases are not legal authorities supporting its contentions here, then we would not need to consider them or the associated registrations further."[9]

Applicant's characterization of the evidence as being limited to that which Applicant "cite[s] as evidence" is erroneous: evidence is either of record or it is not. Applicant is entitled to argue against the weight of legal authorities cited, but if he attempts to support his arguments by citation to evidence not in the record, the argument remains unsupported. *See Cai v. Diamond Hong, Inc.*, 901 F.3d 1367, 127 USPQ2d 1797, 1799 (Fed. Cir. 2018) (quoting *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 424 F.3d 1276, 76 USPQ2d 1616, 1622 (Fed. Cir. 2005) ("Attorney argument is no

---

[7] 27 TTABVUE 4 n. 3 (Applicant's Reply Brief).

[8] *Id.* The particular "legal authorities" referred to by Applicant as the basis for citing to third-party registrations not of record are *In re Eagle Crest Inc.*, 96 USPQ2d 1227 (TTAB 2010); *In re Volvo Cars of N. Am., Inc.*, 46 USPQ2d 1455 (TTAB 1998); *In re Remington Prods., Inc.*, 3 USPQ2d 1714 (TTAB 1987); *America Online, Inc. v. AT&T Corp.*, 243 F.3d 812, 57 USPQ2d 1902 (4th Cir. 2001); *In re Melville Corp.*, 228 USPQ 970 (TTAB 1986); and *In re Peace Love World Live, LLC*, 127 USPQ2d 1400 (TTAB 2018).

[9] *Id.*

substitute for evidence.")).

Rule 2.142(d) of the Trademark Rules of Practice, 37 C.F.R. § 2.142(d), states that the "record should be complete prior to the filing of an appeal" and "[e]vidence should not be filed with the Board after the filing of an appeal." Because Applicant did not make the referenced third-party registrations of record during prosecution, Applicant's citation to them for the first time in its appeal brief is improper.[10] We therefore sustain the Examining Attorney's untimeliness objection, and have given Applicant's references to these materials no consideration. *See, e.g., In re Inn at St. John's, LLC*, 126 USPQ2d 1742, 1744 (TTAB 2018), *aff'd mem.*, 777 F. App'x 516 (Fed. Cir. Sept. 13, 2019).

On a separate but related point, we note that Applicant submitted copies of numerous third-party registration certificates, as well as several office actions from select third-party file history records, in his attempt to illustrate the USPTO's handling of other marks. However, it is well settled that the USPTO must examine every application on the facts presented for compliance with statutory eligibility requirements, and every case is necessarily different. Thus, "even if the PTO earlier mistakenly registered a similar or identical mark suffering the same defect" as Applicant's mark, it does not bind the Board. *In re Cordua Rests., Inc.*, 823 F.3d 594,

---

[10] Even if one could disprove the precedential value of the cited "legal authorities" by submitting copies of third-party registrations, there still is no reason to submit the registrations during the time for briefing. Applicant should have submitted the third-party registrations when the Examining Attorney first cited the cases in the office actions. The proper procedure to make registrations or other evidence of record following institution of an appeal is to file a timely request for remand, with a showing of good cause, for further examination of the involved application(s). *See* TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE (TBMP) § 1207.02 (June 2022).

118 USPQ2d 1632, 1635 (Fed. Cir. 2016); *see also In re Nett Designs*, 236 F.3d 1339, 57 USPQ2d 1564, 1566 (Fed. Cir. 2001); *In re Am. Furniture Warehouse CO*, 126 USPQ2d 1400, 1407 (TTAB 2018) ("[C]onsistency in examination is not itself a substantive rule of trademark law, and a desire for consistency with the decisions of prior examining attorneys must yield to proper determinations under the Trademark Act and rules."). Our determination of whether Applicant's mark is eligible for registration must be based on the evidence of consumer perception in the present record, not the USPTO's treatment of other proposed marks.[11] *See Cordua*, 118 USPQ2d at 1635.

## II.    Background to the Refusal

Applicant was the respondent in the U.S. Supreme Court decision, *Iancu v. Brunetti*, 588 U.S. ___, 139 S. Ct. 2294, 204 L. Ed. 2d 714, 2019 USPQ2d 232043 (2019). In that case, the Office refused Applicant's pending application to register FUCT as a trademark for clothing goods on the sole ground that it comprised scandalous or immoral matter under Section 2(a) of the Trademark Act, 15 U.S.C. § 1052(a). The Federal Circuit reversed the refusal and the Supreme Court affirmed, holding that Section 2(a)'s bar on registering immoral or scandalous matter was

---

[11] We add that Applicant did not also make of record the file histories for most of those third-party registrations. As such, they have little if any probative value with respect to the USPTO's treatment of other proposed marks. *See In re Best Software, Inc.*, 58 USPQ2d 1314 (TTAB 2001) ("We obviously are not privy to the record in the files of the registered marks and, in any event, the issuance of a registration(s) by an Examining Attorney cannot control the result of another case."). *See also In re John Harvey & Sons Ltd.*, 32 USPQ2d 1451, 1455 (TTAB 1994) ("Applicant's prior registrations which include disclaimers or claims of acquired distinctiveness are of little moment" because "[w]e are not privy to the files of those registrations.").

unconstitutional because it discriminated on the basis of viewpoint and, therefore, violated the free speech provisions of the First Amendment. Applicant's mark FUCT for clothing goods was thus permitted to register.

While *Iancu v. Brunetti* was still pending before the Supreme Court, Applicant filed new applications to register the word FUCK, including the four that are the subjects of this consolidated appeal ("the FUCK Applications").[12] Upon initial review, the Examining Attorney determined that FUCK appeared to be scandalous within the meaning of Section 2(a) of the Trademark Act, but did not refuse registration because the constitutionality of that provision was under review. Instead, he suspended the FUCK Applications pending final disposition of Applicant's FUCT appeal.

Following the decision in *Iancu v. Brunetti*, Applicant's FUCK Applications were removed from suspension, reexamined, and refused under Sections 1, 2, 3, and 45 of the Trademark Act, 15 U.S.C. §§1051-1053, and 1127,[13] on the ground that each "applied-for mark is a slogan or term that does not function as a trademark or service mark to indicate the source of applicant's goods and/or services and to identify and distinguish them from others."[14]

---

[12] Applicant filed a fifth FUCK application for hats, socks and t-shirts in Class 25 (Serial No. 87577812), which was suspended pending disposition of two prior pending applications including one for FUKKK for the same goods that is now registered (Registration No. 6158378). Applicant's Class 25 application remains pending and is not part of this consolidated appeal.

[13] Section 3, 15 U.S.C. § 1053, was cited for each of the refusals, but that section is only applicable to a proposed mark identifying services.

[14] *See e.g.,* December 30, 2020 Final Office Action, TSDR 5.

## III. Applicable Law

### A. Statutory Definition of a Trademark

Sections 1, 2, 3 and 45 of the Trademark Act provide the statutory basis for a refusal to register subject matter that fails to function as a trademark. 15 U.S.C. §§ 1051, 1052 and 1127. Specifically:

- Sections 1 and 2, provide for the application and registration on the Principal Register of "trademark[s] by which the goods of the applicant may be distinguished from the goods of others";

- Section 3 provides that service marks are registrable "in the same manner and with the same effect as trademarks"; and

- Section 45 defines a "trademark" and "service mark" in pertinent part, as "any word, name, symbol, or device, or any combination thereof, used by a person, or which a person has a bona fide intention to use in commerce … to identify and distinguish his or her goods [or services], including a unique product [or service], from those manufactured or sold [or provided] by others, and to indicate the source of the goods [or services], even if that source is unknown."

As these provisions make clear, the Office is statutorily constrained to register matter on the Principal Register if and only if it functions as a mark. *See, e.g., In re The Ride*, 2020 USPQ2d 39644, at *5-6 (TTAB 2020). "'Matter that does not operate to indicate the source or origin of the identified goods or services and distinguish them from those of others does not meet the statutory definition of a trademark and may not be registered.'" *Id.* (quoting *In re AC Webconnecting Holding B.V.*, 2020 USPQ2d 11048, at *2-3 (TTAB 2020)); *see also In re Vox Populi Registry, Ltd.*, 25 F.4th 1348, 2022 USPQ2d 115, at *2 (Fed. Cir. 2022) ("Under the Lanham Act, 'no service mark by which the services of the applicant may be distinguished from the services of others shall be refused registration on the principal register on account of its nature' subject

- 9 -

to certain exceptions. 15 U.S.C. §§ 1052-53. One of these exceptions is that a service mark must function to 'identify and distinguish the services of one person . . . from the services of others and to indicate the source of the services.' 15 U.S.C. § 1127.") (cleaned up); *In re Standard Oil Co.*, 275 F.2d 945, 125 USPQ 227, 228 (CCPA 1960) ("The Trademark Act is not an act to register words but to register trademarks.").

Not every designation adopted with the intention that it perform a trademark function necessarily accomplishes that purpose. *In re Texas With Love, LLC*, 2020 USPQ2d 11290, 2-3 (TTAB 2020) (quoting *In re Pro-Line Corp.*, 28USPQ2d 1141, 1142 (TTAB 1993) ("Mere intent that a phrase function as a trademark is not enough in and of itself to make it a trademark.")); *D.C. One Wholesaler, Inc. v. Chien*, 120 USPQ2d 1710, 1713 (TTAB 2016) (granting petition to cancel registration on the Supplemental Register where "the marketplace is awash in products that display the term."). Certain designations "are inherently incapable of functioning as trademarks to identify and distinguish the source of the products in connection with which they are used." *Eagle Crest,* 96 USPQ2d at 1229 (affirming refusal to register ONCE A MARINE, ALWAYS A MARINE for clothing because it would be perceived as an informational slogan "to express support, admiration or affiliation with the Marines.").

If the evidence shows that consumers would not perceive the proposed mark as performing the Congressionally-defined functions of a trademark under Section 45, then, under Sections 1 and 2 – which all require "trademarks" – such proposed marks may not be registered. *See, e.g.*, *Vox Populi*, 2022 USPQ2d 115, at *2 (noting that

"consumer perception" is important "[i]n analyzing whether a proposed mark functions as a source identifier") (citations omitted); *cf. U.S. Patent and Trademark Office v. Booking.com B.V.*, 140 S. Ct. 2298, 2304, 2020 USPQ2d 10729, at *5 (2020) (emphasizing "the Lanham Act's focus on consumer perception" in a case concerning whether a proposed mark is generic).

### B. Failure to Function

One way a proposed mark fails to function is if consumers will view it as a merely informational slogan or phrase instead of something that "point[s] out distinctively the origin of the goods to which it is attached." *In re Bose Corp.*, 546 F.2d 893, 192 USPQ 213, 215 (CCPA 1976). For decades, the Board and its primary reviewing courts have held that "[s]logans and other terms that are considered to be merely informational in nature … are not registrable." *Eagle Crest,* 96 USPQ2d at 1229. *See, e.g., In re Boston Beer Co.*, 198 F.3d 1370, 1374, 53 USPQ2d_1056, 1058 (Fed. Cir. 1999) (holding that THE BEST BEER IN AMERICA "is a common phrase used descriptively by others before and concurrently with [the applicant]'s use, and is nothing more than a claim of superiority" that is incapable of registration as a trademark); *Roux Labs., Inc. v. Clairol, Inc.*, 427 F.2d 823, 166 USPQ 34, 39 (CCPA 1970) ("The mere fact that a combination of words or a slogan [such as HAIR COLOR SO NATURAL ONLY HER HAIRDRESSER KNOWS FOR SURE] is adopted and used by a manufacturer with the intent [that it function as a trademark] does not necessarily mean that the slogan accomplishes that purpose in reality."); *In re Duvernoy & Sons, Inc.*, 212 F.2d 202, 101 USPQ 288, 289 (CCPA 1954) ("we feel

manifestly certain from the nature of the notation [CONSISTENTLY SUPERIOR] sought to be registered that it was not originally adopted or intended to function as a trade mark to indicate origin of the appellant's goods, and it does not satisfactorily appear to us from the exhibits in the record that the appellant has ever used the term in question as a primary means for identifying its goods."). *See also* TMEP § 1202.04 (July 2022).

Matter may be merely informational and fail to function as a trademark if it is a common term or phrase that consumers of the goods or services identified in the application are accustomed to seeing used by various sources to convey ordinary, familiar, or generally understood concepts or sentiments. Such widely used messages will be understood as merely conveying the ordinary concept or sentiment normally associated with them, rather than serving any source-indicating function. *See, e.g.*, *D.C. One Wholesaler,* 120 USPQ2d at 1716 (sustaining opposition to registration of I ♥ DC for clothing because it "has been widely used, over a long period of time and by a large number of merchandisers as an expression of enthusiasm, affection or affiliation with respect to the city of Washington, D.C." and thus would not be perceived as a source-indicator); *In re Volvo Cars of N. Am., Inc.*, 46 USPQ2d at 1460-61 (affirming refusal to register DRIVE SAFELY for automobiles because it would be perceived as an everyday, commonplace safety admonition); *see also* TMEP § 1202.04(b) (widely used messages).

"The critical inquiry in determining whether a proposed mark functions as a trademark [or service mark] is how the relevant public perceives it." *Univ. of Ky. v.*

*40-0, LLC*, 2021 USPQ2d 253, at *13 (TTAB 2021) (citing *In re Greenwood*, 2020 USPQ2d 11439, at *2 (TTAB 2020). When "there are no limitations on the channels of trade or classes of consumers of the [goods and services] identified in the application, the relevant consuming public comprises all potential purchasers of … [such goods]." *Id.*, at *24 (citing *Mayweather Promotions, LLC*, 2020 USPQ2d 11489, at *3 (TTAB 2020)). "'To make this determination, we look to [any] … evidence of record showing how the designation is actually used in the marketplace.'" *Texas with Love, LLC*, 2020 USPQ2d 11290, at *2 (quoting *Eagle Crest,* 96 USPQ2d at 1229, and noting that "widespread use of a term or phrase may be enough to render it incapable of functioning as a trademark, regardless of the type of message.").

"Consumers ordinarily take widely-used, commonplace messages at their ordinary meaning, and not as source indicators, absent evidence to the contrary." *In re Greenwood*, 2020 USPQ2d 11439, at *6 (citing *In re Mayweather Promotions, LLC*, 2020 USPQ2d 11489, at *6. "The more commonly a phrase is used, the less likely that the public will use it to identify only one source and the less likely that it will be recognized by purchasers as a trademark." *Id.* (citing *Eagle Crest,* 96 USPQ2d at 1229). "Where the evidence suggests that the ordinary consumer would take the words at their ordinary meaning rather than read into them some special meaning distinguishing the goods and services from similar goods and services of others, then the words fail to function as a mark." *In re Ocean Tech., Inc.*, 2019 USPQ2d 450686, at *3 (TTAB 2019) (internal punctuation omitted).

### IV. The Examining Attorney's Arguments and Evidence

The Examining Attorney's evidence falls into two general categories: evidence purporting to show ubiquity of the word FUCK in general; and evidence purporting to show widespread third-party ornamental use of the word FUCK on various consumer goods. As to ubiquity, the Examining Attorney first relies on dictionary definitions and articles "from numerous internet websites and internet-based periodicals" to "illustrate[] that the term [FUCK] is commonly used as a versatile expression conveying a wide range of emotion, from disdain to joy."[15] Consumers, he asserts, therefore "would not perceive the use of the term as a mark identifying the source of Applicant's goods and/or services but rather as only conveying an informational message or sentiment":[16]

<u>Definitions</u>

- Urban Dictionary (urbandictionary.com) defines FUCK as "a way to express extreme anger at a specific person."[17]

- American Heritage Dictionary (ahdictionary.com) defines FUCK, when used as a phrasal verb (e.g., fuck off), as a word "used in the imperative as a signal of angry dismissal."[18]

- Collins Dictionary defines FUCK, as an exclamation "used to express anger or annoyance."[19]

- Dictionary.com, based on the Random House Unabridged Dictionary (2021), defines FUCK as a slang or vulgar interjection "used to express anger, disgust, peremptory rejection, etc., often followed by a pronoun,

---

[15] 26 TTABVUE 12 (Examining Attorney's Brief).

[16] 26 TTABVUE 12 (Examining Attorney's Brief).

[17] March 9, 2021 Reconsideration Letter, TSDR 197.

[18] *Id.* at 190-191.

[19] *Id.* at 173.

as *you* or *it*.).[20]

- Wikipedia (Wikipedia.org) defines FUCK as "a profane English-language word which often refers to the act of sexual intercourse but is also commonly used as an intensifier or to denote disdain. … In modern usage, the term *fuck* and its derivatives (such as *fucker* and *fucking*) can be used as a noun, a verb, an adjective, an interjection or an adverb."[21]

Articles

- An article from the Huffington Post (huffpost.com) titled "A F*cking Short History of the F-Word," dated May 29, 2013, provides a brief discussion of the word FUCK, from its derivation as an impolite term used to describe sexual intercourse in the 16th century, to an offensive swear word in the mid-19th century. "Only in the early to mid-nineteenth century did it begin to be used non-literally, as most swearwords are, to insult and offend others, to relieve pain, and to express extremes of emotion, negative and positive."[22]

- An article from Strong Language, A Sweary Blog About Swearing (stronglang.wordpress.com) titled "How 'fuck' went mainstream," dated October 22, 2015, shares an extract for an upcoming book *From Skedaddle to Selfies: Words of the Generations* by Allan Metcalf. According to the author, "[e]ven major dictionaries declined to include *fuck* until quite recently, yet it now appears without fuss in an impressive range of cultural domains."[23]

- An article from Vogue magazine (vogue.com) titled "The F-Word Is on the Effing Rise," dated August 6, 2019, discusses the growth in popularity of FUCK: "The public fucks are flowing freely because for many people, in a clime that has reached fever pitch, a freak or an eff simply does not capture the emotion of the gun-violence epidemic or the humanitarian crisis at the U.S. southern border. There is a sweet, satisfying release that only the F-bomb can bring."[24]

- An article from The Roarbots (theroarbots.com) titled "John Scalzi on the Most Versatile Word in Any Language," dated April 7, 2020,

---

[20] *Id.* at 180-181.

[21] *Id.* at 11-19.

[22] *Id.* at 151-154.

[23] December 30, 2020 Final Office Action, TSDR 22-26.

[24] *Id.* at 42-45.

describes many uses and meanings of the word FUCK. According to Scalzi, "'[f]uck' is a universal swear word"; "the word has existed in English since the 1500s at least"; "it's fuckin' useful" as a verb, a noun, an adjective, an interjection, and pretty much any part of speech you want it to be"; "it's a really *fun* word. It's easy to use, and gives a nice jolt to any sentence it's in"; and "its ubiquity is an argument for its use – because it's naturally part of our everyday speech…."[25]

- An article from Medium (medium.com) titled "Why 'F*ck' Is the Word of the Year - How the word became a virtue signal in 2018," dated December 11, 2018, describes the ubiquitous nature of the word FUCK and how it has become overused. "[W]hy does everyone use it? For the same reasons rich old men date young, beautiful women. *Because they can.*"[26]

- An article on the website of novelty retailer Spencers (spencersonline.com) titled "Why We Love the Word Fuck" describes FUCK as an "all-purpose word" and explains why it is used so frequently on the company's merchandise:[27]

   > [W]hy, exactly, is the word 'fuck' so special, and why does it appear on so many of our most popular t-shirts, hats, socks and even fleece blankets?
   >
   > Well, for one thing, fuck is an all-purpose word. You can use it say 'Fuck yeah' or 'That fucking sucks.' A parting shot of 'Go fuck yourself' or 'Fuck you' in an argument is the perfect way to signal how you really feel. No one can resist the lure of this ultimate naughty word. Even **President John F. Kennedy** has used the f word. … A little f-u-c-k adds just the right emphasis in our opinion. …
   >
   > It's impressive just how much power this short but mighty word holds in our society. …
   >
   > Why beat around the bush? You're a big fucking deal, so let everyone know it. Ultimately, the versatility of "fuck" is summed up in this t-shirt that we think really fuckin' says it all. Don't you?

---

[25] *Id.* at 94-97.

[26] March 9, 2021 Reconsideration Letter, TSDR 168-172.

[27] *Id.* at 164-167 (emphasis in original).



[Photo from Spencers article]

Based on this evidence, the Examining Attorney concludes that:

> The word "FUCK" is one of the most versatile words in the English lexicon – in certain contexts it is capable of provoking; in others, it conveys nothing at all, other than, perhaps, a sense of world-weariness ... "[f]ew words in our ever-expanding language are as flexible or versatile." This speech intensifier, once seldom spoken in polite company, has so proliferated in vernacular and commercial usage as to render it common, popular and ordinary. And while the term can signal many meanings, its very ubiquity renders it incapable of serving as a source-identifier for trademark purposes.[28] …

> The evidence of record, from numerous internet websites and internet-based periodicals, illustrates that the term is commonly used as a versatile expression conveying a wide range of emotion, from disdain to joy. Because consumers are accustomed to seeing this term or expression commonly used in everyday speech by many different sources, they would not perceive the use of the term as a mark identifying the source of Applicant's goods and/or services but rather as only conveying an informational message or sentiment.[29]

---

[28] 26 TTABVUE 8 (Examining Attorney's Brief) (citing Wikipedia article attached to the December 30, 202 Office Action, TSDR 51).

[29] *Id.* at 12.

The Examining Attorney also provides evidence from various third-party sources that he argues "further shows widespread third-party use of this commonplace term on the kinds of goods encompassed by the application[s]," such as those shown in the following examples:

- Assorted listings from Etsy show use of the word FUCK on mugs, art prints, rings, tote bags, pins, and pillow covers:[30]







---

[30] November 8, 2019 Office Action, TSDR 5; March 9, 2021 Reconsideration Letter, TSDR at 63, 68-69, 71, 73 (etsy.com). Description of tote bag: "This stylish tote is perfect for showing how few f*cks you can give." One review of the FUCK pins: "Absolutely gorgeous way to make an important statement!" One review of the pillow cover: "Such a perfect pillow for a lady like me who can't go one sentence without my favorite word ☺[.]"






- Spencers advertises a variety of FUCK merchandise, such as the hats, necklaces, plugs, fanny packs, earrings, nipple rings, and pins:[31]




---

[31] *Id.* at 22 – 29 (spencersonline.com).



- Spreadshirt offers a variety of FUCK merchandise, such as the computer and lunch bags shown below:[32]



- Threadless offers FUCK merchandise such as the t-shirt, face masks, and magnets:[33]



---

[32] *Id.* at 30-31 (spreadshirt.com).

[33] *Id.* at 42-55 (threadless.com).

- Redbubble advertises t-shirts, phone cases, and travel mugs that display the word FUCK:[34]



---

[34] *Id*. at 78, 82-83, 86-87, 91-92 ((redbubble.com). The pages, respectively, indicate the mug image is available on +37 products, the phone case images are available on +74 products, and travel mug images are available on +50 products.

- Artist Shot advertises FUCK phone cases, pillows, tote bags, mousepads, and buttons:



35

- Dolls Kills offers FUCK tote bags for sale:[36]



- Dress Code offers a FUCK wallet and key chain for sale:[37]



---

[35] *Id.* at 96-99 (artistshot.com) (emphasis by Examining Attorney).

[36] *Id.* at 102 (dollskill.com).

[37] *Id.* at 112 (dresscodeclothing.com).

- Embers Cinders advertises FUCK tote bags and t-shirts: [38]



- Fine Art America offers a variety of goods for sale that display the word FUCK, including bags, prints, posters, greeting cards, phone cases, pillows, duvet covers, shower curtains, beach towels, carry-all pouches, battery chargers, apparel, coffee mugs, yoga mats, notebooks, fleece blankets, tapestries, face masks, and puzzles: [39]



---

[38] *Id.* at 116-17 (emberscinders.com). Description of the tote advises: "Let this FUCK font express collective outrage and frustration towards the latest attacks on women's rights. FUCK. Fuck legislating women's bodies. Fuck, at least we are in this together."

[39] *Id.* at 123-26 (fineartamerica.com). Red arrow emphasis added by Examining Attorney.

- Explore Sex Talk advertises the sale of FUCK bags, bikinis, pillows, and flip flops:[40]

 

  

- Amazon offers FUCK jewelry such as necklaces and rings:[41]

  

---

[40] *Id.* at 119-17 (exploresextalk.com). Description of the tote reads: "Sometimes 'fuck' is the only word to perfectly describe a situation. It's a great word because it's incredibly versatile in how it can be used and what it can mean. This tote bag can be the perfect sentiment for a WIDE variety of situations."

[41] *Id.* at 205-06.

- Tulsa Body Jewelry advertises FUCK tongue rings:[42]



- Just for the Money Jewelry advertises a FUCK ring:[43]



Summarizing, the Examining Attorney concludes that:

> The evidence … illustrates that many competitors use the term as an informational message on jewelry, bags, phone cases, and many other items. … This evidence also indicates that the term cannot serve to distinguish the Applicant' goods and services from goods and services of others who similarly use the term in connection with goods such as jewelry, bags, wallets, backpacks, carrying cases and related goods and services. In sum, the evidence of record illustrates that the term FUCK, for the Applicant's goods and services, fails to function as a trademark because the term does not identify or distinguish the applicant' goods and services from other goods and services using the term.[44]

## V. Applicant's Evidence and Arguments

### A. The Widely-Used Commonplace Word "Doctrine"

Applicant argues that "[t]he PTO refuse[d] [his] application solely because FUCK allegedly is a Widely-Used Commonplace Word"[45] and not because of its alleged

---

[42] *Id.* at 255-56 (tulsabodyjewelry.com).

[43] *Id.* at 257-59 (justforthemoneyjewelry.com).

[44] 26 TTABVUE 23 (Examining Attorney's Brief).

[45] 22 TTABVUE 8 (Applicant's Brief).

failure to function as a mark. According to Applicant:

> The PTO's brief mentions in passing Failure to Function. But that was not the ground for refusal. The PTO repeatedly chose to stand by Widely-Used Commonplace Words as its sole ground for refusal. On appeal, it is too late for the PTO to add a completely different ground for refusal. And Brunetti would strenuously object to any remand to add a new ground.[46]

However, the Examining Attorney mentions or paraphrases "failure to function" 26 times in his brief, which can hardly be characterized as a mention in passing.[47] Further, the Examining Attorney in this case clearly stated the legal basis for the refusal in each office action preceding the briefing of the appeal:

> Registration is refused because the applied-for mark is a slogan or term that does not function as a trademark or service mark to indicate the source of applicant's goods and/or services and to identify and distinguish them from others. Trademark Act Sections 1, 2, 3, and 45, 15 U.S.C. §§1051-1053, 1127.[48]

Applicant's responses to the office actions refusing registration in each case also acknowledged that the refusals were indeed based on the proposed mark's failure to function under Trademark Act §§ 1, 2, 3, and 45. Indeed, Applicant quoted the refusal language noted above in his responses to each of the refusals directly under the heading "**PTO's Ground for Refusal**," asserting that [t]he PTO offers no evidence showing that the public could not identify **FUCK** as "identifying the source of applicant's goods" or that it only "convey[s]" an informational message," so "the

---

[46] 27 TTABVUE 3 (Applicant's Reply Brief).

[47] 26 TTABVUE 4-5, 7-10, 12, 17-20, 25 (Examining Attorney's Brief).

[48] November 8, 2019 Office Action, TSDR 4; December 30, 2020 Final Office Action, TSDR 5; March 9, 2021 Reconsideration Letter, TSDR 6.

refusal should be withdrawn.[49]

Applicant repeatedly conflates the basis for the refusal (failure to function as a mark under Trademark Act Sections 1, 2, 3, and 45) with evidence the Examining Attorney presents to support the refusal (that FUCK is such a widely-used commonplace term that it would not be perceived as an indicator of source). Continuing, Applicant asserts that:

> The PTO acknowledges that there is no statutory basis for the "Widely-Used Commonplace Word doctrine. Rather, the PTO contends the doctrine is found somewhere in the Lanham Act. The PTO cites Section 1, and Section 2, and Section 3, and Section 45. Where in such sections the purported doctrine is contained, the PTO does not say. The PTO cites to no specific language that establishes the doctrine. The reason is there is none.[50]

We agree that the Trademark Act does not specifically articulate "failure to function" *in haec verba* as a ground for refusal of a proposed mark. However, as explained above, the starting point for registration is the statutory definition of a trademark. A word that fails to distinguish goods or services does not meet the statutory definition of a trademark, and thus cannot be registered. 15 U.S.C. §§ 1051, 1127.

The statute also does not specify the type of evidence that would show that a proposed mark falls outside the definition of a trademark, such as the evidence presented in this case that a particular designation merely conveys an informational message widely used by a variety of sources that it would not be perceived as a source

---

[49] May 8, 2020 Office Action Response, TSDR 6-7; January 20, 2021 Request for Reconsideration, TSDR 47 (emphasis in original).

[50] 22 TTABVUE 8 (Applicant's Brief).

indicator to distinguish the goods and services of the user from those of others. However, that is not the issue, nor is it unique in the Trademark Act. The Trademark Act does not specify the types of evidence for likelihood of confusion, mere descriptiveness, genericness, or other words or symbols disqualified from registration; the decisional law of this Board (and the Federal Circuit and its predecessor) does. Like genericness, "failure to function" finds its statutory basis in Section 45's definition of a trademark. And, an entire body of law – starting over 60 years ago with the Court of Customs and Patent Appeals decision in *Standard Oil* – has developed that provides guidance on how Trademark Act Section 45's definition of "trademark" applies to merely informational matter, including widely-used commonplace terms and expressions.

That body of law recognizes that such terms and expressions are usually taken by consumers at their ordinary meaning and are not perceived as identifying and distinguishing one party's goods from those of others or indicating their source. The critical inquiry is how a proposed mark would be perceived by the relevant public. *See Vox Populi*, 2022 USPQ2d 115 at \*2 (noting the focus on consumer perception in analyzing whether a proposed mark functions as a source identifier); *Texas with Love, LLC*, 2020 USPQ2d 11290, at \*2 ("The critical inquiry in determining whether a proposed mark functions as a trademark [or service mark] is how the relevant public perceives it."). And that is the standard we apply in this case to determine whether Applicant's proposed mark FUCK would be perceived as a mark – as defined by the Trademark Act – for the identified goods and services.

Applicant also contends that "there is no valid Widely-Used Commonplace Word doctrine [as] is clear from the PTO's own Trademark Manual of Examining Procedure."[51] According to Applicant, "[a]lthough Section 1202 of the TMEP contains nineteen subsections, there is none for the Widely-Used Commonplace Word doctrine. In fact, those words do not appear anywhere in the TMEP."[52] Applicant, however, overlooks TMEP § 1204.04 and cases cited therein, which discuss the "various reasons" that "[m]atter may be merely informational and fail to function," including subsection (b) that discusses "widely-used messages," in particular.[53]

Applicant follows the same path with respect to legal treatises. Asking, "What does the leading treatise on trademarks say" about the "Widely-Used Commonplace Doctrine"?[54] Applicant purports to answer this question by quoting a paragraph from Professor McCarthy's discussion of the "'Common word' fallacy" with respect to the strength of marks, part of his larger discussion on the spectrum of distinctive marks.[55] In that quote, Professor McCarthy notes that:

> Some courts occasionally make loose reference to the fact that plaintiff's mark is a "common word" found in the dictionary and is therefore

---

[51] *Id.*

[52] *Id.*

[53] "Although the [TMEP] does not have the force of law, it 'sets forth the guidelines and procedures followed by the examining attorneys at the'" USPTO. *In re Int'l Flavors & Fragrances, Inc.*, 183 F.3d 1361, 51 USPQ2d 1513, 1516 (Fed. Cir. 1999) (quoting *W. Fla. Seafood, Inc. v. Jet Rests., Inc.*, 31 F.3d 1122, 31 USPQ2d 1660, 1664 n.8 (Fed. Cir. 1994)). Elsewhere in its brief, Applicant acknowledges the validity of what it calls the "Widely Used Message/Expression Doctrine," which Applicant contends the PTO is attempting to confuse the Board with by citing cases involving that doctrine. We discuss that argument separately below.

[54] 22 TTABVUE 8-9 (Applicant's Brief).

[55] *Id.*

"weak." But this is a non sequitur. That a word is in "common usage" is quite irrelevant. The issue is whether that word is in common usage as a mark for similar goods or services such that its distinctiveness in the customer's mind is blurred. Some of the strongest marks are "common words" found in the dictionary. For example, SHELL, CAMEL, and APPLE. They are intrinsically strong because they are arbitrary when applied to gasoline, cigarettes and computers, respectively. They are also strong under the second prong because they are widely known and recognized by customers as marks.

2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:87 (5th ed. March 2022 Update).

Applicant's quotation of McCarthy, though accurate, is taken out of context and concerns a different issue. The issue of distinctiveness, which comes into play when discussing the strength of a mark, depends not only on its inherent nature ("conceptual strength"), but also its market recognition value ("commercial strength"). *In re Chippendales USA, Inc.*, 622 F.3d 1346, 96 USPQ2d 1681, 1686 (Fed. Cir. 2010). Professor McCarthy considers it a fallacy to include consideration of non-trademark uses in the evaluation of a mark's strength. 2 MCCARTHY § 11:88. "For example, a word mark is not necessarily a 'weak' mark because it is a word that is in widespread non-trademark use." *Id.*

The spectrum of distinctiveness, and where a candidate mark falls along that spectrum, is not relevant in the context of a failure to function refusal, which considers whether a designation functions as a mark in the first place, notwithstanding its possible strength when used for particular goods or services. As Professor McCarthy also explains in his chapter on "The Functions of Trademarks," "*It is Very Difficult to Achieve Trademark Status for Common Words and*

*Informational Slogans and Images.* … Even when prominently displayed, these kinds of indicia may not perform the job of identifying source." 1 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 3:5 (emphasis in original). Indeed, "[m]any of the Board's failure-to-function cases have dealt with phrases in the American vernacular that were found to be incapable of functioning as marks due to their nature," *In re Yarnell Ice Cream, LLC*, 2019 USPQ2d 265039, at *17 (TTAB 2019).

### B.    Applicability of the Case Law Cited by the Examining Attorney

Applicant maintains that the "case law does not support a Widely-Used Commonplace Word Doctrine" because his "search for 'widely-used commonplace word' revealed no case in the Federal Circuit, TTAB or elsewhere that adopts, or even cites, such doctrine."[56] Applicant's argument is pure semantics. The proper focus is not on the number of words or the nature of any intended expression or message, but on the plethora of uses that prevent the term from being perceived as an indicator of a single source of the goods or services at issue.

Applicant also mischaracterizes the cases cited by the Examining Attorney, as well as their holdings. For example, Applicant asserts that "the PTO relies heavily on *Eagle Crest,* 96 USPQ2d at 1229, "for the proposition that ONCE A MARINE ALWAYS A MARINE is not registrable. … It is extremely puzzling to see why the PTO cites *Eagle Crest* for a proposition [that] it clearly ***does not*** actually stand for."[57] The Examining Attorney, however, does not cite *Eagle Crest* because it has a fact

---

[56] 22 TTABVUE 9 (Applicant's Brief, emphasis in original).

[57] *Id.* at 11.

pattern analogous to this case, but rather for the principles that apply, including that:

- "not every designation adopted with the intention that it performs a trademark function and even labeled as a trademark necessarily accomplishes that purpose [] and there are certain designations that are inherently incapable of functioning as trademarks to identify and distinguish the source of the products in connection with which they are used";

- "whether a designation functions as a mark is how the designation would be perceived by the relevant public";

- "[s]logans and other terms that are considered to be merely informational in nature … are not registrable"; and

- "[t]he more commonly a phrase is used, the less likely that the public will use it to identify only one source and the less likely that it will be recognized by purchasers as a trademark."

*Id.* at 1229. Based on the record in that case, the Board found that the phrase ONCE A MARINE, ALWAYS A MARINE "would not be perceived as a trademark to identify and distinguish [the] applicant's [clothing] goods from the like goods of others." *Id.*

In another example, Applicant mischaracterizes the Board's finding in *D.C. One Wholesaler*. Without pointing to the record, Applicant asserts that "[t]he PTO reads *D.C. One* as creating an inflexible rule that LOVE Place marks cannot be registered. … The Board only found that I [Heart] D.C. should be cancelled because most of [the] registrant's uses were ornamental."[58] But as the Examining Attorney notes, the petitioner in *D.C. One Wholesaler* opposed registration of the phrase I ♥ DC on the Principal Register, and sought cancellation of a registration for the same phrase on the Supplemental Register, on the ground "that Respondent's mark is 'incapable of

---

[58] 22 TTABVUE 11 (Applicant's Brief).

distinguishing Respondent's goods from the goods of others and therefore cannot function as a trademark and an indicator of source."[59] Hence, the Board did not grant cancellation because most of the registrant's uses were ornamental, as Applicant contends, but rather "[b]ecause the nature of the phrase [I ♥ DC] will be perceived as informational, and also because the ubiquity of the phrase I ♥ DC on apparel and other souvenirs of many makers has given it a significance as an expression of enthusiasm, it does not create the commercial impression of a source indicator, even when displayed on a hangtag or label." *D.C. One Wholesaler,* 120 USPQ2d at 1716. It therefore "fails to function as a trademark **for the Respondent's goods**." *Id*. at 1717 (emphasis added).[60]

We agree with Applicant that Board precedent does establish that there are designations, including certain widely-used messages, which are inherently

---

[59] 26 TTABVUE 17 (Examining Attorney's Brief).

[60] Applicant's contention that *D.C One Wholesaler* was a "default case" because "[t]he registrant did not file a brief," that "default cases usually do not make for good law because the tribunal only hears one side," and that "[l]ack of contrary authorities can mislead the tribunal," 22 TTABVUE 11 (Applicant's Brief), lacks any legal support. The fact that the respondent in *D.C. One Wholesaler* did not file a brief did not make it a default case, since "[t]he filing of a brief on the case is optional, not mandatory, for a party in the position of defendant," TBMP § 801.02(b) (citing Trademark Rule 2.128(a)(1), 37 C.F.R. § 2.128(a)(1)), and in any event, does not indicate that there are "contrary authorities" to the principles discussed in *D.C. One Wholesaler*. Indeed, the Board deemed the issue it decided there important enough to designate the decision as precedential. Nor does Applicant's evidence of third-party registrations for other marks that include the wording "LOVE" and a geographic place (Serial No. 88310900, TSDR January 28, 2021 Request for Reconsideration) establish authorities contrary to the principles discussed in *D.C. One Wholesaler* or the many other cases discussed throughout this opinion. The Board is not constrained by the decisions of examining attorneys regarding other marks based on different application records. To the contrary, "the [US]PTO must decide each application on its own merits, and decisions regarding other registrations do not bind either the [USPTO] or [the reviewing] court." *In re Boulevard Entm't*, 334 F.3d 1336, 67 USPQ2d 1475, 1480 (Fed. Cir. 2003).

incapable of being regarded as source indicators. On the other hand, we reject his contention that the cases relied on by the Examining Attorney in this case, "[r]ead properly," merely "stand or the rules that generic uses are not registrable and ornamental specimens do not show trademark use."

The Federal Circuit has held that "the source identifier requirement is broader than just whether a proposed mark is generic or descriptive." *Vox Populi*, 2022 USPQ2d 115 at *2 (noting the Board's determination "that certain categories of applications fail to function as a source identifier, such as matter that 'merely convey[s] general information about the goods or services or an informational message,'" and citing TMEP § 1202.04 and *D.C. One Wholesaler*, 120 USPQ2d at 1716)). Board precedent clearly establishes that designations that are merely informational, including certain widely-used messages, fail to function as a mark and cannot be registered. As stated earlier, in cases "[w]here **the evidence** suggests that the ordinary consumer would take the words at their ordinary meaning rather than read into them some special meaning distinguishing the goods and services from similar goods and services of others, then the words fail to function as a mark." *In re Greenwood*, 2020 USPQ2d 11439, at *6 (quoting In *re Ocean Tech., Inc.*, 2019 USPQ2d 450686, at *3 (emphasis added, internal punctuation omitted)).

Additional arguments made by Applicant promote the erroneous premise that the FUCK Applications were refused solely because FUCK is a widely-used message, with no evaluation of whether FUCK would be perceived as an indicator that goods and services have a single source. For example, Applicant asserts that "The PTO Does

Register Widely-Used Commonplace Words," providing in support a Wikipedia page titled "Most common words in English" and random third-party registration certificates for marks comprised of or including each of those words, which he argues "filled the PTO's void with actual evidence" and "shows that 100% of the 100 most commonly used words in the English language are registered!"[61] He concludes that "[s]ince the evidence is that FUCK is less common than the 100 most common words (all of which are registered), then FUCK must be registered too."

Mere commonality, however, is not the test. Instead, "[w]e must assess whether Applicant's proposed mark, [FUCK], functions as a mark based on whether the relevant public, i.e. purchasers or potential purchasers of the identified [] goods and [] services … would perceive [FUCK] as identifying the source or origin of such goods and services." *In re Team Jesus LLC*, 2020 USPQ2d 11489, at *2 (TTAB 2020). *See also In re Aerospace Optics, Inc.*, 78 USPQ2d 1861, 1862 (TTAB 2006) ("[T]he critical inquiry is whether the asserted mark would be perceived as a source indicator.").

As the Examining Attorney notes, "Applicant's list lacks context," and "Applicant has not provided any evidence that consumers regularly encounter these terms used in the same way as the mark in question, namely, as an expression that is commonly used as such on a wide variety of goods." We agree, and find that the cited third-party registrations for other single word marks, perceived in a vacuum without any contextual information, are not relevant to our determination of whether FUCK functions as a mark for the applied for goods and services.

---

[61] 22 TTABVUE 16-17 (Applicant's Brief).

## VI. Analysis of the Refusal

We turn now to an analysis of the Examining Attorney's evidence and our determination of whether it supports a finding that FUCK fails to function as a mark for the goods and services identified in the FUCK Applications for goods in International Classes 9, 14, and 18, and services in International Class 35. If the refusal of registration applies to any of the goods or services within the class, registration is refused as to the entire class.[62] *See In re Chamber of Commerce of the U.S.,* 675 F.3d 1297, 102 USPQ2d 1217, 1219 (Fed. Cir. 2012) *quoting In re Stereotaxis Inc.,* 429 F.3d 1039, 77 USPQ2d 1087, 1089 (Fed. Cir. 2005) ("A descriptiveness refusal is proper "if the mark is descriptive of any of the [goods or services in the class] for which registration is sought."); *Tuxedo Monopoly, Inc. v. General Mills Fun Group,* 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981) (a likelihood of confusion must be found as to an application when it is shown as to "*any item* that comes within the description of goods set forth by appellant in its application") (emphasis in original); *In re Analog Devices, Inc.*, 6 USPQ2d 1808, 1810 (TTAB 1988) ("registration is properly refused if the subject matter for registration is descriptive of any of the goods for which registration is sought … There is no logical reason to treat differently a term that is generic of a category or class of products

---

[62] This practice serves to minimize submission and consideration of duplicative evidence. An applicant who believes its goods or services within a single class are not alike, but warrant different treatment with respect to a refusal, has the option of dividing its application and each "child" application will separately examined. *See* Trademark Rule 2.87; *In re Olin Corp.* 124 USPQ 1327, 1337 (TTAB 2017) ("we acknowledge the Examining Attorney's arguments that Applicant did not file a request to divide the subject application, which may have opened a pathway to show acquired distinctiveness of the mark as to those particular goods."); and TMEP § 1110.

where some but not all of the goods identified in an application fall within that category.") *aff'd*, 871 F.2d 1097, 10 USPQ2d 1879 (Fed. Cir. 1989) (unpublished).

Notably, Applicant has neither argued against nor presented evidence that rebuts the showing made by the Examining Attorney regarding consumer perception of the term FUCK. Instead, Applicant primarily challenges the Office's methodology in determining whether a mark is widely-used, and offers other arguments that are off target due to his insistence that registration of FUCK was not refused for failing to function as a mark.

### A. Ubiquity of FUCK

The evidence in this case shows that the word FUCK is no ordinary word, but rather one that has acquired a multitude of recognized meanings since its first recorded use, and whose popularity has soared over the years, particularly in recent times, transforming what was once a taboo word to be spoken in hushed tones to one that is trendy and cosmopolitan. Although the word FUCK has been "a choice word of artists, politicians, and musicians for centuries,"[63] "major dictionaries declined to include fuck until quite recently, yet it now appears without fuss in an impressive range of cultural domains."[64]

FUCK is used not only to describe sexual intercourse, but as a word intensifier "to express extremes of emotion, negative and positive"[65] (e.g., shock), to note disdain,

---

[63] December 30, 2020 Final Office Action, TSDR at 55-59.

[64] *Id.* at TSDR 22-26.

[65] March 9, 2021 Reconsideration Letter, TSDR 151-154.

sadness, confusion, panic, boredom, annoyance, disgust, or pleasure; to insult or offend; and to evoke other emotions.[66] FUCK is arguably one of the most expressive words in the English language – an "all-purpose word."[67] We find that the record in this case amply demonstrates the ubiquity of the term FUCK as an expression to convey a wide-range of recognized concepts and sentiments, including those noted above. As quoted above, Applicant explicitly concedes the widely expressive quality of FUCK, and states that he "intends to use the FUCK mark" to "critique capitalism, government, religion and pop culture," because the "use of FUCK is integral to his viewpoint."[68]

Applicant asserts that "[i]t is never possible to disprove the PTO's conclusion that something is 'common' or 'widely used' if the PTO only relies on evidence of use, and ignores evidence of the relative frequency. Under the PTO's approach, its conclusion can never be proven false."[69] Applicant asserts that he "put such data into the record," referring to a couple of "Google Books Ngram Viewer" graphs (reproduced in an Appendix to this opinion) that he submitted with his request for reconsideration but did not explain. The graphs purport to show the relative frequency of the word "fuck"

---

[66] December 30, 2020 Final Office Action, TSDR 55-59; March 9, 2021 Reconsideration Letter, TSDR 11-19, 164-167, 173.

[67] *Id.* at 164-167.

[68] 22 TTABVUE 23.

[69] 22 TTABVUE 16 (Applicant's Brief). "Relative frequency" is defined as "the ratio of the frequency of a particular event in a statistical experiment to the total frequency". MERRIAM-WEBSTER Dictionary (merriam-webster.com), accessed February 14, 2022. The Board may take judicial notice of dictionary definitions from online sources when the definitions themselves are derived from dictionaries that exist in printed form or have regular fixed editions. *See In re White Jasmine LLC*, 106 USPQ2d 1385, 1392 n.23 (TTAB 2013); *In re Red Bull GmbH*, 78 USPQ2d 1375, 1378 (TTAB 2006).

as compared to certain other words (i.e., nice, parents, pure, shape, standard, universal, and university) appearing in books over the course of more than 200 years from 1800 to recent times.[70]

Applicant's argument is flawed in various respects. As the Examining Attorney correctly notes, "Applicant's relative frequency standard would be impractical to administer in examination and does not appear to measure consumer perception, which is the relevant inquiry."[71] Mere commonness, as we explained, is not the basis for the refusal, and FUCK's "relative frequency," as compared to other words over the course of 200 years, has little bearing on our determination of whether current consumers would view FUCK as a source identifier for the identified goods and services.[72]

Applicant further argues that "[t]here is *no evidence*" to support the USPTO's assumption "that if something is *used* (let us even assume *widely-used*) then the public cannot consider the word as a source identifier."[73] This argument also fails. The Examining Attorney is required to establish a reasonable predicate for his position—i.e., a prima facie case—that FUCK is not registrable and did so here with evidence showing that FUCK is so ubiquitously used as an informational sentiment that the relevant public would not perceive FUCK as indicating the source of the

---

[70] January 20, 2021 Request for Reconsideration, TSDR 480-81 (Exhibit 12).

[71] 26 TTABVUE 22-23 (Examining Attorney's Brief).

[72] Notably, though, unlike the other words shown on the graph, "fuck" has had an upward trend in usage since 2000.

[73] 22 TTABVUE 18 (Applicant's Brief).

goods and services in the application. The Examining Attorney is not required to prove to a moral certainty that consumers will not perceive FUCK to function as Applicant's mark. *See In re Pacer Tech.*, 338 F.3d 1348, 1351-52, 67 USPQ2d 1629, 1632 (Fed. Cir. 2003) (explaining that the USPTO has "limited resources" and "cannot be expected to shoulder the burden of conducting market research"). It is enough that the third-party use evidence here "'is competent to suggest that upon encountering Applicant's 'mark', prospective purchasers familiar with such widespread non-trademark use are unlikely to consider it to indicate the source of Applicant's goods [or services].'" *Team Jesus*, 2020 USPQ2d 11489, at *6 (quoting *In re DePorter*, 129 USPQ2d 1298, 1302 (TTAB 2019)). Applicant was required to come forward with competent evidence that consumers would perceive the proposed mark as a source identifier to rebut the showing made by the Examining Attorney. *See In re Becton, Dickinson & Co.*, 675 F.3d 1368, 102 USPQ2d 1372, 1376-77 (Fed. Cir. 2012); *In re Gyulay*, 820 F.2d 1216, 3 USPQ2d 1009, 1010 (Fed. Cir. 1987) ("Rebuttal evidence and argument are the applicant's province."). Applicant failed to offer any evidence of consumer perception of *this* proposed mark that would rebut the robust prima facie case made out by the Examining Attorney.

Applicant also asserts that FUCK "is not informational" but, instead, "is arbitrary as to all goods in [the FUCK] applications"; that "[i]n its continuing search for a justification for the [Widely-Used Commonplace Word] Doctrine, the PTO tried 'too many definitions' as a basis"; and that "[i]f LOVE can be allowed despite having many

meanings, then FUCK should be also."[74] According to Applicant, any term can be a trademark "as long as it is not generic," but "[t]he PTO has not explained why 'fuck' is the name for a class of products or services for any of the items in Brunetti's identification."[75]

We disagree that trademark law dictates that anything which is not generic necessarily is a trademark. In Trademark Act Section 45, Congress defined what could be registered—trademarks—but it did not purport to define every way that terms or symbols for which registration is sought fail to perform the function of a trademark. Genericness is one way—but not the only way—that a proposed "mark" fails to function as a mark. *See, e.g.*, *Vox Populi*, 2022 USPQ2d 115 at *2 (explaining that "the source identifier requirement is broader than just whether a proposed mark is generic or descriptive").

We need not belabor the point about Applicant's mistaken theory on the basis for the refusal, or his unpersuasive argument that simply because other common words may be registrable, FUCK is automatically registrable too. There are multiple reasons why a term or other indicia may fail to function as a mark, whether because it is nondistinctive trade dress, a title of a single work, a varietal name, or a repeating pattern, to name a few. Registration is not available if the matter to be registered fails to function as a mark, and we do not need to find that FUCK is generic for a

---

[74] *Id.* at 10 n.4, 19 (Applicant's Brief) (internal quote unattributed). Applicant is referring to various definitions he made of record for "love," and several third-party registrations comprised by the literal wording LOVE for use on or in connection with various goods and services. *Id.*; January 20, 2021 Request for Reconsideration, TSDR 887, 932-936.

[75] 27 TTABVUE 5 (Applicant's Reply Brief).

class of goods or services to find that it fails to function as a mark. Suffice to say that Applicant's attempt to limit the refusal to terms or phrases that provide "specific information about the goods," is also unavailing because "[a] term may still fail to function as a mark even if it does not convey information about the goods." *Mayweather Promotions*, 2020 USPQ2d 11298, at \*10. Likewise, "[a]n expression need not convey a specific type of message to be inherently incapable of functioning as a mark. *Texas With Love*, 2020 USPQ2d 11290, at \*7 ("[W]idespread use of a term or phrase may be enough to render it incapable of functioning as a trademark, regardless of the type of message.").

FUCK is a message that is commonly used on the types of goods as to which Applicant wants exclusive rights to the term. As one author noted, "its ubiquity is an argument for its use – because it's naturally part of our everyday speech."[76] It is a term that, as retailer Spencers (one of the many retailers that sells FUCK merchandise) puts it, is "the perfect way to signal how you really feel."[77] Applicant suggests that he intends to use FUCK similarly to critique capitalism, government, religion and pop culture. Applicant thus concedes that he intends to use FUCK as the word is commonly understood, to convey the sentiment he hopes prospective consumers of his goods and services will take away from its display.[78] However,

---

[76] *Id.* at 94-97.

[77] March 9, 2021 Reconsideration Letter, TSDR 164-167.

[78] Applicant's additional contention that that "Single Words Are Not 'Widely Used Messages" because "[o]f all the cases cited by the PTO in this application or in the TMEP, only two involve a single word," is a non sequitur. In any event, a "message" is simply "a communication in writing, in speech, or by signals"; a "usually short communication transmitted by words, signals, or other means from one person, station, or group to another";

conveying sentiments of anger, annoyance, disgust, and humor (all meanings conveyed by the term FUCK) towards capitalism, government, religion, and pop culture, are hardly novel. "Familiar every day expressions used to convey social [or] political … concepts are more likely to be perceived as imparting information than signifying source." *In re Hulting*, 107 USPQ2d 1175, 1179 (TTAB 2013) ("[A]s the record reflects, consumers would not view the proposed mark as an indicator of the source of applicant's goods due to the nature of the political message conveyed.").

### B. FUCK in the Marketplace

The record in this case demonstrates that a variety of sources prominently display the term FUCK on a wide range of consumer merchandise and household items, including the kinds of goods identified in the FUCK Applications, e.g., phone cases, laptop cases, jewelry, earrings, rings, bracelets, ornamental lapel pins, carrying bags, fanny packs, tote bags, and wallets. Prominent use of an applied-for-mark, as shown in the examples of record, "is probative in determining whether a term or phrase would be perceived in the marketplace as a trademark or as a widely used message." *Mayweather Promotions*, 2020 USPQ2d 11298, at *4; *In re Hulting*, 107 USPQ2d at 1179 ("Clearly, the placement, size, and dominance of the wording are consistent with informational (or ornamental), not trademark use.").

Applicant claims the USPTO "asserted that if the word or phrase is on products offered on Esty.com or Amazon, then it is unregistrable. Apparently, even a small

---

and the "substance of such communication; the point or points conveyed." MERRIAM-WEBSTER Dictionary (merriam-webster.com) and AMERICAN HERITAGE Dictionary (ahdictionary.com), accessed February 10, 2022.

number of uses is sufficient to make the word unregistrable. [Applicant] will refer to this argument as the Etsy.Com Rule."[79] However, the USPTO did not say this and, contrary to Applicant's contention, the record does not reflect "a small number of uses" where FUCK is used on goods for the purpose of conveying a message in a manner that does not indicate source. Rather, "[t]he evidence shows that in the relevant field of goods," including the fields of smart phone accessories, jewelry, and bags, as well as in related product fields traditionally used to display messages, such as clothing, the retail marketplace "is awash in products that display the term [FUCK] as a prominent ornamental feature of such goods, in such a way that the display itself is an important component of the product and customers purchase the product precisely because it is ornamented with a display of the term in an informational manner, not associated with a particular source." *D.C. One Wholesaler*, 120 USPQ2d at 1716.

In any event, we find the copious evidence of these websites probative because they are online marketplaces offering goods of third-party sellers to United States consumers, which are reflective of many different sellers in the marketplace offering goods with the term FUCK to consumers, and they provide relevant evidence of consumer perception.

---

[79] 22 TTABVUE 14 (Applicant's Brief). Based on data from third-party sources provided with his January 20, 2021 Request for Reconsideration, 967-68, Applicant contends that "Amazon has 12 million products so even 100 examples is only 0.000833%," and "Etsy has 2.5 million sellers," so "[a] dozen sellers is 0.00048%. Even if the PTO increased its examples hundredfold, 'widely-used' is not proven since the percentages are still infinitesimal." 22 TTABVUE 17. At the risk of repeating ourselves too much, commonality is not the test. Moreover, the evidence of commercial use of FUCK is not limited to Etsy and Amazon.

## VII.   Conclusion on the Refusal

The function of a trademark is to identify a single source and to distinguish that seller's goods from others, and the Trademark Act does not allow registration unless a proposed mark serves this function. The record before us establishes that the word FUCK expresses well-recognized familiar sentiments and the relevant consumers are accustomed to seeing it in widespread use, by many different sources, on the kind of goods identified in the FUCK Applications. Consequently, we find that it does not create the commercial impression of a source indicator, and does not function as a trademark to distinguish Applicant's goods and services in commerce and indicate their source. *Team Jesus*, 2020 USPQ2d 11489, at *18-19. Consequently, Applicant cannot appropriate the term exclusively to itself, denying others the ability to use it freely. "'[I]t is the type of expression that should remain free for all to use.'" *Univ. of Kentucky v. 40-0, LLC*, 2021 USPQ2d 253, at *36 (quoting *Eagle Crest*, 96 USPQ2d at 1230).

The record shows that the FUCK Applications identify goods that are commonly used both for functional purposes and to display messages. More specifically, the record shows that the International Class 9 goods such as carrying cases for various electronic devices, the International Class 14 goods such as rings and bracelets, and the International Class 18 goods such as backpacks and tote bags, are commonly used as vehicles to display messages that appeal to consumers. We find that consumers who encounter FUCK on such goods sold at retail will not perceive the phrase as a source indicator pointing uniquely to Applicant no matter whether Applicant ultimately displays the term on these goods in the manner of a conventional mark or

not. *See D.C. One Wholesaler,* 120 USPQ2d at 1716.[80]

Similarly, Applicant's International Class 35 services include "retail store and online retail store services featuring accessories for cellphones and computers, audio disks, audio-visual disks, bags, bedding, books, cigarette lighters, clothing, decals, downloadable music files, downloadable audio-visual files, footwear, headwear, housewares, jewelry, sporting goods, stickers, sunglasses, towels, toys and watches," and we find that consumers who encounter FUCK used in connection with such retail services featuring goods commonly used for conveying messages will not perceive FUCK as a source indicator pointing uniquely to Applicant. *In re Wal-Mart Stores, Inc.*, 129 USPQ2d 1148, 1152 (TTAB 2019) ("Similarly, we find that consumers would perceive INVESTING IN AMERICAN JOBS as merely an informational statement that Applicant is selling certain goods that are made or assembled in America in areas of the store where the signage appears.").

Rather, when encountering Applicant's retail store services featuring those goods, consumers will still perceive FUCK as conveying its ordinary meaning. *See Standard Oil,* 125 USPQ at 229 ("It must be assumed that the ordinary customer reading the advertisements displayed by an automobile service station would take the words [guaranteed starting] at their ordinary meaning rather than read into them some

---

[80] Even if the application had been approved and Applicant thereafter showed use of term in an ornamental manner, a failure to function refusal would be appropriate because the term would not be perceived as a mark. *See e.g., D.C. One Wholesaler*, 120 USPQ2d at 1716; *Damn I'm Good Inc. v. Sakowitz, Inc.*, 514 F. Supp. 1357, 212 USPQ 684 (S.D.N.Y. 1981) (where plaintiff used DAMN I'M GOOD as a message engraved on a bracelet and commenced use of the term on a hangtag only after competitors began to produce similar products, court held that "plaintiff does not hold a valid trademark.").

special meaning distinguishing the services advertised from similar services of other station operators."). In other words, consumers will not view FUCK-identified retail store services as an indicator of source pointing uniquely to Applicant.

## VIII. Constitutionality of the Refusal

### A. Applicant's Argument that the Supreme Court's Decision in *Iancu v. Brunetti* Requires Registration of FUCK

We turn now to Applicant's arguments for registration based on the Supreme Court's decision in *Iancu v. Brunetti*, which Applicant invokes repeatedly throughout its appeal briefs. According to Applicant, "[i]t was clearly understood by the U.S. Supreme Court that, if it invalidated the Scandalous and Immoral Clauses [of Section 2(a) of the Trademark Act], then FUCK and the N-word would be registered. … Now that the Supreme Court has ruled, the PTO is attempting to evade the *Brunetti* decision."[81] Applicant maintains that "[t]he refusal to approve [his] mark is based on the PTO's perception of the viewpoint conveyed by [him] and his mark."[82]

To support his contention that he is "a victim of government viewpoint discrimination,"[83] Applicant compares this case with the USPTO's handling of third-party applications to register marks purportedly expressing viewpoints the Office finds acceptable. For example, Applicant made of record copies of two office actions issued for third-party application Serial No. 88540893, where the applicant sought to

---

[81] 22 TTABVUE 6 (Applicant's Brief).

[82] *Id.* at 23.

[83] *Id.* at 24.

register NIGGA for clothing.[84] In that case, as in the FUCK Applications, the examining attorney issued an advisory during prosecution indicating that registration might be refused due to the scandalous nature of the term, and suspended the application pending disposition of the Supreme Court's ruling in the *Iancu v. Brunetti*.[85] After the Court invalidated the scandalous and immoral provision of Section 2(a), the examining attorney issued a new refusal of NIGGA based on the Sections 1, 2, and 45 of the Trademark Act, 15 U.S.C. §§ 1051, 1052, and 1127, on the ground that the term fails to function as a mark for the goods identified because it merely conveys an ordinary, familiar, and well-recognized concept or sentiment.[86]

On the other hand, Applicant argues, "[t]he PTO is glad to register marks that convey viewpoints that the PTO supports, namely ones that approve of capitalism, the government, religion and culture."[87] As examples, Applicant asserts that "[t]he PTO did not raise the doctrine against REAL NIGGAS, Reg. 6006281, [for clothing] owned by the Black Hall of Fame, LLC ([as] obviously a positive use, 'reclaiming' the word)," and "FUCK CANCER THE MUSICAL [for a theatrical performance of a music play in Reg. No. 6121669] is allowed because the PTO thinks that is a positive message. [Applicant's] FUCK is refused because the PTO finds his meaning to be 'disdain.'"[88]

---

[84] January 20, 2021 Request for Reconsideration, TSDR 251-56.

[85] *Id.* at 251-53.

[86] *Id.* at 254-56.

[87] 11 TTABVUE 23 (Applicant's Brief).

[88] *Id.* at 24 (citing Reg. No. 6121669, a copy of which was submitted with Applicant's January 20, 2021 Request for Reconsideration, TSDR 880).

The Examining Attorney disagrees with Applicant's position, pointing out that:

> [T]he issue before the Courts [in *In re Brunetti* and *Iancu v. Brunetti*] was the constitutionality of the "scandalous" and "immoral" clauses [of] Section 2(a) of the Trademark Act. The appeal did not present the issue of a failure to function refusal under Sections 1, 2, 3 and 45 of the Trademark Act based on an evidentiary determination that term FUCT is a commonplace term that would not be perceived by consumers as indicating the source of the applied-for goods. Simply stated, no failure to function refusal was at issue in the prior examination of that other term.[89]

We agree with the Examining Attorney that the decision in *Iancu v. Brunetti* does not dictate the result here. That decision concerned only the prohibition in Section 2(a) on registration of marks containing scandalous matter; it is common ground in this appeal that no refusal based on Section 2(a) would be permissible. Nothing in *Iancu v. Brunetti* requires the USPTO to register a term that would have been refused under Section 2(a) if it is otherwise unregistrable under other provisions of the statute. The First Amendment does not require the USPTO, through federal registration, to confer on any applicant the exclusive right to use an expressive term that fails to function as a mark and thereby deny others the ability to use it freely.

As we discussed above, the refusal in this case – failure to function as a mark under Trademark Act Sections 1, 2, 3, and 45 – is focused on whether consumers would perceive the matter sought to be registered as a "trademark" as that term is defined in the Trademark Act. Section 45 of the Trademark Act defines what a trademark is, and only terms and symbols meeting that definition may qualify to be registered under Sections 1, 2, and 3. *See, e.g., In re The Standard Oil Co.*, 275 F.2d

---

[89] 26 TTABVUE 19 (Examining Attorney's Brief).

945, 125 USPQ 227, 228 (CCPA 1960 ("Before there can be registration, there must be a trademark, and unless words have been so used they cannot qualify.").

The failure to function refusal is not grounded in disagreement with, or prohibition against, any expressive message a proposed mark may convey. The focus of the refusal is whether the relevant consumers perceive FUCK as a trademark (i.e., an indicator of source) or as merely a commonly-used word that would not be perceived to indicate a single source of products or services or identify and distinguish the products or services from those sold by others. The refusal is viewpoint neutral. Where evidence shows that consumers would not perceive the matter sought to be registered as a trademark, the refusal applies evenhandedly, regardless of any viewpoint expressed.

## B. Applicant's Claim of Biased Treatment

Applicant also argues that the refusal is an effort by the USPTO to deny him his constitutional right to free expression. Applicant contends that "[w]hat this case is about is simple: the PTO has granted dozens of registrations for FUCK. It just refuses to approve [Applicant's] application because he is [Applicant]."[90]

As to asserted "fuck" registrations issued before *Iancu v. Brunetti* was decided on June 24, 2019, Applicant refers to the following seven third-party marks: WTF

---

[90] 22 TTABVUE 5 (Applicant's Brief).

WORK?;[91] FAUQ-YEAH!,[92] WTF WHERE'S THE FOOD TRUCK and Design,[93] SAUCY_AF,[94] WTFHAPPENED.COM,[95] LOCAL AF,[96] and LIVE AF,[97] for various goods and services.[98] None of these include the word "fuck." As to registrations for FUCK issued after *Iancu v. Brunetti* was decided, Applicant refers to the following 32 third-party marks, none of which is for the word FUCK by itself:

> THE FUCK IT DIET;[99] RENO AS FUCK;[100] FANCY_AF;[101] PROUD AS FUCK;[102] FUCK YOU JOURNAL;[103] NAMASTE AS FUCK;[104] UNFUK YOURSELF;[105] F*CK YA FASHION;[106] IT'S EASY TO GIVE A F*CK;[107]

---

[91] January 20, 2021 Request for Reconsideration, TSDR 842 (Reg. No. 4332574, registered May 7, 2013; cancelled).

[92] *Id*. at 843 (Reg. No. 5282969, registered September 5, 2017; Supplemental Register).

[93] *Id*. at 844 (Reg. No. 5642124, registered January 1, 2019).

[94] *Id*. at 845 (Reg. No. 5699181, registered March 12, 2019).

[95] *Id*. at 846 (Reg. No. 4389264, registered August 20, 2013; cancelled).

[96] *Id*. at 847 (Reg. No. 5316602, registered October 24, 2017).

[97] *Id*. at 848 (Reg. No. 5363804, registered December 26, 2017).

[98] 22 TTABVUE 16 (Applicant's brief).

[99] *Id*. at 849 (Reg. No. 5934906, registered December 17, 2019).

[100] *Id*. at 850 (Reg. No. 5941883, registered December 24, 2019).

[101] *Id*. at 851 (Reg. No. 5957824, registered January 7, 2020).

[102] *Id*. at 852 (Reg. No. 5987091, registered February 18, 2020).

[103] *Id*. at 853 (Reg. No. 5999456, registered March 3, 2020).

[104] *Id*. at 854 (Reg. No. 5999466, registered March 3, 2020).

[105] *Id*. at 856 (Reg. No. 6004830, registered March 10, 2020).

[106] *Id*. at 857 (Reg. No. 6005021, registered March 10, 2020).

[107] *Id*. at 858 (Reg. No. 6011493, registered March 17, 2020).

FUCK SLEEP;[108] FUCKWATER;[109] FUCK THIS SHIT SHOW;[110] FUCK FEAR, MAKE LOVE.;[111] UNF*UCK YOUR BUSINESS;[112] UNFUCK YOUR HABITAT;[113] SHUT THE FUCK UP FRIDAY;[114] F*CK FIFTY;[115] PINK AS FUCK;[116] STAY QUEER AS FUCK;[117] FCK SML TLK;[118] FUCK. THE GAME and Design;[119] THE F**K BUTTON;[120] F*CKBOY REPELLENT;[121] WAKE THE F**K UP;[122] CALM THE F**K DOWN;[123] I'M NOT GOING TO FUCK YOU;[124] EAT. LAUGH. FUCK.;[125] FLORIDA AS FUCK;[126] FUCK LUCK BABE,

[108] *Id*. at 859 (Reg. No. 6015995, registered March 24, 2020).

[109] *Id*. at 860 (Reg. No. 6016077, registered March 24, 2020).

[110] *Id*. at 861 (Reg. No. 6018964, registered March 24, 2020).

[111] *Id*. at 862 (Reg. No. 6021504, registered March 31, 2020).

[112] *Id*. at 863 (Reg. No. 6027332, registered April 7, 2020).

[113] *Id*. at 864 (Reg. No. 6053246, registered May 12, 2020).

[114] *Id*. at 865 (Reg. No. 6060187, registered May 19, 2020).

[115] *Id*. at 866 (Reg. No. 6065945, registered May 26, 2020).

[116] *Id*. at 867 (Reg. No. 6077440, registered June 16, 2020).

[117] *Id*. at 868 (Reg. No. 6078369, registered June 16, 2020).

[118] *Id*. at 869 (Reg. No. 6083845, registered June 23, 2020).

[119] *Id*. at 870-71 (Reg. No. 6093119, registered July 7, 2020).

[120] *Id*. at 872 (Reg. No. 6098471, registered July 14, 2020).

[121] *Id*. at 873 (Reg. No. 6098487, registered July 14, 2020).

[122] *Id*. at 874 (Reg. No. 6098496, registered July 14, 2020).

[123] *Id*. at 875 (Reg. No. 6098497, registered July 14, 2020), same owner as in note 35).

[124] *Id*. at 876 (Reg. No. 6102527, registered July 14, 2020).

[125] *Id*. at 877 (Reg. No. 6108875, registered July 21, 2020).

[126] *Id*. at 878 (Reg. No. 61108609, registered July 28, 2020).

HANG ON TIGHT;[127] FUCK CANCER THE MUSICAL;[128] SAD AS FUCK;[129] and FUCK WHAT THEY SAY.[130]

Apart from the one pending application (now a registration) for FUKKK, which as noted earlier is a potential bar to another application of Applicant's, all of the 32 registered third-party marks cited by Applicant as issuing after the *Iancu v. Brunetti* decision are for terms or slogans that include other wording in addition to FUCK; have different connotations and commercial impressions; and in many instances cover different goods and services. Thirteen of them do not even include the word FUCK.

We find that the marks in these third-party registrations are not probative to show that the Office has followed a practice of permitting registrations for FUCK except for Applicant. At the threshold, the Office examines and makes registrability determinations based on marks as a whole as they relate to the goods and/or services identified in a particular application, and therefore these registrations do not speak to the registrability of the word FUCK by itself for the goods specified in these applications. Second, the basis for the refusal here is not Applicant's use of the word

[127] *Id*. at 879 (Reg. No. 6119840, registered August 4, 2020).

[128] *Id*. at 880 (Reg. 6121669, registered August 11, 2020).

[129] *Id*. at 855, 881 (Reg. Nos. 5999505 and 6144541, registered March 3 and September 8, 2020, respectively, different owners).

[130] *Id*. at 882 (Reg. No. 6146178, registered September 8, 2020). 10 TTABVUE 17. Applicant also cited two pending applications for the marks TIME TO FUCK? and FUKKK that the USPTO allowed post-*Iancu v. Brunetti*. However, "third-party applications have no probative value except to show that an application has been filed." *In re Kysela Pere et Fils Ltd.*, 98 USPQ2d 1261, 1264 (TTAB 2011). *See also Interpayment Servs. Ltd. v. Docters & Thiede*, 66 USPQ2d 1463, 1467 n.6 (TTAB 2003) (third-party applications are evidence only of the fact that they were filed).

FUCK, but instead the mark's failure to function as a trademark; Applicant has not attempted to, and could not, demonstrate that registrations have been issued for marks that do not function as trademarks merely because they use the word FUCK.[131]

Applicant has not provided any evidence that plausibly suggests the USPTO maintains any bias against him for prevailing in his appeal of the Office's refusal to register a different word (FUCT) based on a different statutory basis (Section 2(a)'s now invalidated scandalous and immoral provision), or is motivated by his exercise of his first amendment rights. "The third-party registrations of different marks are of little probative value in this case, which must be decided on its own particular facts and circumstances." *Flowers Indus., Inc. v. Interstate Brands Corp.*, 5 USPQ2d 1580, 1588 n. 8 (TTAB 1987); *see also Cordua*, 118 USPQ2d at 1635; *In re Shinnecock Smoke Shop*, 571 F.3d 1171, 1174, 91 USPQ2d 1218, 1221 (Fed. Cir. 2009) ("Applicant's allegations regarding similar marks are irrelevant because each application must be considered on its own merits.").

### C. Applicant's Argument That Because the USPTO Did Not Refuse FUCT based on "the Widely-Used Commonplace Word doctrine," the USPTO May Not Refuse FUCK on that Basis

Applicant argues that the refusal is an effort through arbitrary action to deny him

---

[131] As noted above, Applicant relies on copies of each registered third-party mark obtained from the USPTO database. We are unable to determine, however, from the face of the registration certificates the context under which these third-party registrations were permitted. The registrations thus have little to no probative value. *See In re Inn at St. John's, LLC*, 126 USPQ2d at 1746 (TTAB 2018) (discussing limited probative value of registrations of words that are not identical to the words in the cited mark), *aff'd mem.*, 777 Fed. Appx. 516 (Fed. Cir. 2019).

his constitutional right to free expression. Specifically, Applicant contends that the USPTO cannot base a refusal of FUCK on grounds that were not raised as a bar to his registration of FUCT. As he explains:

> The Government filed six briefs and letter briefs in *Brunetti* in the Federal Circuit and the Supreme Court. Had the Widely-Used Commonplace Word doctrine been applicable, the Government was required to raise it in order to avoid the constitutional issue. The Government's best attorneys from both the Department of Commerce (i.e, the PTO) and the Department of Justice were assigned to the case. Yet none of the briefs mention the Widely-Used Commonplace Word doctrine. The reason: there was no such doctrine as to scandalous marks until the PTO created it after *Brunetti*. Brunetti is unaware of any application for a scandalous or disparaging mark that was refused as a Widely-Used Commonplace Word until after the *Brunetti* decision. Then, the PTO "discovered" the doctrine.[132]

Applicant's argument is based on flawed premises and we reject it for at least two reasons. First, the refusal of registration of common terms based on failure to function as a mark long preceded *Brunetti. See Standard Oil*, 125 USPQ at 229 ("It must be assumed that the ordinary customer reading the advertisements displayed by an automobile service station would take the words [GUARANTEED STARTING] at their ordinary meaning rather than read into them some special meaning distinguishing the services advertised from similar services of other station operators."); *In re Tilcon Warren, Inc.*, 221 USPQ 86, 88 (TTAB 1984) ("The Examining Attorney believes the expression 'WATCH THAT CHILD' when displayed on the front bumper of such large trucks as cement mixers, will not be perceived by either purchasers or prospective purchasers as a single source or origin of the goods

---

[132] 22 TTABVUE 6 (Applicant's Brief).

in question or as distinguishing the applicant's ready-mixed cement or crushed stone from that sold by others."); *cf. In re Boston Beer Co.*, 198 F.3d 1370, 53 USPQ2d 1056, 1058 (Fed. Cir. 1999) ("The proposed mark is a common, laudatory advertising phrase which is … so highly laudatory and descriptive of the qualities of its product that the slogan *does not and could not function* as a trademark to distinguish Boston Beer's goods and serve as an indication of origin.") (emphasis added).

Second, it is settled law that "[e]ach application for registration must be considered on its own merits." *In re Merrill Lynch, Pierce, Fenner, & Smith, Inc.* 828 F.2d 1567, 4 USPQ 1141, 1143 (Fed. Cir. 1987) (citing *In re Loew's Theatres, Inc.*, 769 F.2d 764, 226 USPQ 865, 869 (Fed. Cir. 1985)); *see also Eagle Crest*, 96 USPQ2d at 1229 ("It has been said many times that each case must be decided on its own facts.") (internal citations omitted). Trademark Rule 2.61(a), 37 C.F.R. § 2.61(a), provides that applications for registration "will be examined and, if the applicant is found not entitled to registration **for any reason**, applicant will be notified and advised of the reasons therefor…." (emphasis added). *See also* 15 U.S.C. § 1052(b). It does not matter in examining this application whether Applicant's previous application for a different mark was not refused on failure to function grounds. *See Cordua*, 823 F.3d 594, 118 USPQ2d at 1635. As the Examining Attorney pointed out, "[t]hat the USPTO did not also refuse registration on th[e] basis [of failure to function] in the prior case does not preclude it from raising any other valid basis for refusing registration of the term at issue based on the evidence of record in this case."[133] Under the circumstances, we

---

[133] 26 TTABVUE 19 (Examining Attorney's Brief).

find that there is nothing arbitrary or erroneous about the Examining Attorney adducing evidence in support of a failure to function refusal of the mark in this application and refusing registration on that basis.

*Decision*: The refusal to register FUCK for failure to function as a mark under Sections 1, 2, 3 and 45 of the Trademark Act for the goods and services identified in Application Serial Nos. 88308426, 88308434, 88308451 and 88310900, is affirmed.

Serial Nos. 88308426, 88308434, 88308451, and 88310900

Appendix



Serial Nos. 88308426, 88308434, 88308451, and 88310900



- 60 -